UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JOYCE M. HALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:14-CV-714-CEJ |
| | ) | |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

### I.    Procedural History

On April 29, 2011, plaintiff Joyce M. Hall filed applications for disability insurance benefits, Title II, 42 U.S.C. §§ 401, *et seq.*, and supplemental security income, Title XVI, 42 U.S.C. §§ 1381, *et seq.*, with an alleged onset date of September 26, 2009.  (Tr. 123–29)  After plaintiff's application was denied on initial consideration (Tr. 73–78), she requested a hearing from an Administrative Law Judge (ALJ).  (Tr. 81–82)   Plaintiff and counsel appeared for a hearing on September 24, 2012.  (Tr. 31–48)  The ALJ issued a decision denying plaintiff's application on October 18, 2012.  (Tr. 9–26)  Plaintiff requested the Appeals Council reverse the ALJ's decision and remand for a new hearing.  (Tr. 7–8)  The Appeals Council denied plaintiff's request for review on March 4, 2014.   (Tr. 1–4) Accordingly, the ALJ's decision stands as the Commissioner's final decision.

### II.    Evidence Before the ALJ

### A.    Disability Application Documents

Plaintiff was born on May 9, 1957. (Tr. 123) She is married and has no dependents. (Tr. 124) She filed for workers compensation in 2006, but that claim was denied. *Id.* She also filed a previous claim for disability benefits, which was denied on September 29, 2009. (Tr. 49–59)

Plaintiff completed a Function Report on May 10, 2011. (Tr. 144–54) She described her daily activities as follows: "[I] get up at 6:30 A.M. I wash up and eat breakfast, drop [my] granddaughter off at school and then go to the arthritis class at the Y[MCA]. [I] come back[,] rest, watch TV, get [the] mail, check on [my] sister, prepare dinner, watch [a] soap opera, then try to remember to take [my] med[ications]. . . . [I am i]n bed by 10:00 but back up by midnight and then it's up [and] down all night." *Id.* Plaintiff cared for her granddaughter, which included dropping her off at school and picking her up. (Tr. 145) She also cared for a dog, though she was seeking a new home for it because she "can't do [the] upkeep for him." *Id.*

According to plaintiff, her conditions have left her unable to cook large meals, walk on her treadmill, ride a bike, lift weights, watch television without falling asleep, or drive or type for long periods of time. *Id.* She reported waking up at night with pain, which sometimes resulted in her being unable to sleep all night long. *Id.* She also reported that she had some difficulty dressing because her fingers cramp; it was also difficult for her to bathe herself, such that she limited showering to twice weekly, opting for sponge baths on other days. *Id.* Her joints also stiffened up after she lies down at night. *Id.* She occasionally experienced incontinence. *Id.*

Plaintiff prepared her own meals, took medication and groomed herself without reminders, and she was able to wash dishes, iron clothes, and change bed linens.  (Tr. 146)  She was unable to bend and stoop to do yardwork, though she went outside nearly every day, sometimes driving herself to the store or to pick up medications, as needed.  (Tr. 147)  Plaintiff reported that she experiences anxiety and hand cramping when attempting to drive long distances, so she avoided highways and driving at night.  (Tr. 147, 149)  She was able to pay bills and manage her finances without assistance.  *Id.*  She watched television and used Facebook daily.  (Tr. 148)  She regularly visited her sister, went to church, attended the YMCA and neighborhood meetings, went to the doctor, and talked to friends on the phone.  *Id.*

Plaintiff claims that she has difficulty lifting, squatting, bending, standing, walking, sitting, kneeling, climbing stairs, remembering things, completing tasks, concentrating, and using her hands.  (Tr. 149)  Specifically, she has difficulty remembering where she places certain things, and her hands cramp up when she performs certain tasks at length.  *Id.*  She also complains of "back spasms," "joint stiffness," "aching," and "blurred vision" at times.  *Id.*  Consequently, plaintiff reported that she can only walk "half of [a] block and back" before needing to rest. *Id.*  She claims that stress causes her "anxiety."  (Tr. 150)

Plaintiff utilizes a back brace and a hand splint, as well as glasses.  *Id.*  She claimed to use the hand splint only while in bed, and the back brace only when "doing dishes and when having pain."  *Id.*  She also asserts that if she is "very active" during the day, she will then have a "back spasm" when she tries to sleep. (Tr. 151)  She also claimed to suffer from left-side facial pain, which she rubs "a

lot." *Id.* For her conditions, plaintiff reported taking Amlodipine,[1] Naproxen,[2] Alprazolam (Xanax),[3] and Dexilant (Lansoprazole).[4]

In a Disability Report, plaintiff listed her medical conditions as follows: "Hand, back, and knee problems; osteoarthritis in back, knees, [and] severe in hands; severe bilateral hand pain, stiffness, [and] cramping; bilateral loss of grip [with] a thumb tremor; [status post-operation for] wrist surgery [in 2008 and] knee surgery [in 2008]; carpal tunnel syndrome; knee pain [and] immobility; back pain [and] immobility; anxiety [and] panic attacks; drop[ping] things without warning; [and] residual facial pain from surgery." (Tr. 164)

Plaintiff had a mass on her salivary gland in 2009, which was surgically excised on January 27, 2010. (Tr. 168) She also had wrist surgery in November 2008 and knee surgery in August 2006, for which she received cortisone[5] injections. (Tr. 171) Plaintiff also participates in "water aerobics" for her arthritis. (Tr. 174)

---

[1] "Amlodipine is used alone or in combination with other medications to treat high blood pressure and chest pain (angina). Amlodipine is in a class of medications called calcium channel blockers. It lowers blood pressure by relaxing the blood vessels so the heart does not have to pump as hard. It controls chest pain by increasing the supply of blood to the heart." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a692044.html (last visited July 13, 2015).

[2] **Error! Main Document Only.** Naproxen is the generic name for Naprosyn, a nonsteroidal anti-inflammatory drug used for relief of the signs and symptoms of tendonitis and pain management. *See Phys. Desk Ref.* 2769-70 (60th ed. 2006).

[3] "Alprazolam is used to treat anxiety disorders and panic disorder (sudden, unexpected attacks of extreme fear and worry about these attacks). Alprazolam is in a class of medications called benzodiazepines. It works by decreasing abnormal excitement in the brain." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684001.html (last visited July 13, 2015).

[4] "Prescription lansoprazole is used to treat gastroesophageal reflux disease (GERD), a condition in which backward flow of acid from the stomach causes heartburn and possible injury of the esophagus (the tube between the throat and stomach)." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a695020.html (last visited July 13, 2015).

[5] "Hydrocortisone is similar to a natural hormone produced by [the] adrenal glands. It is used to treat, but not cure, certain forms of arthritis; asthma; and skin, blood, kidney, eye, thyroid, and intestinal disorders." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682871.html (last visited July 13, 2015).

In a Disability Report Appeal completed on June 21, 2011, plaintiff complained that she experiences cramps on the left side of her head, and back and neck pain "that[']s unbearable when holding [her] head down for a while."  (Tr. 183)  She had begun taking 50 mg of Savella[6] twice daily, which she claimed caused her to have "hot flashes, headaches, fatigue, weird dreams," and made her fall asleep quickly but not be able to remain asleep.  *Id.*  She had discontinued her Xanax, and she suffered from dry mouth and continued to suffer from anxiety.  *Id.* Plaintiff also complained that she was cooking less and was more fatigued, and her appetite had decreased while at the same time she was thirsty more often.  (Tr. 187, 190)  She also claimed that she was suffering from acid reflux, for which she was prescribed Nexium;[7] she was also given a prescription for Meclizine[8] for dizziness.  (Tr. 193)

Plaintiff's past relevant work was as a clerical worker for the National Archives and Records Administration (NARA), a position she held from 1987 until 2007.  (Tr. 133–39, 155)  Her other past relevant work was as a store cashier from 1999 until 2002.  (Tr. 155)  As a clerical worker, plaintiff was required to type, answer telephones, examine military records, redact Social Security numbers, search for and copy specific documents, and transport files.  (Tr. 156)  She would sit for approximately seven hours out of an eight-hour workday.  *Id.*  The heaviest

---

[6]"**Error! Main Document Only.**Savella is the brand name for Milnacipran, a selective serotonin and norepinephrine re-uptake inhibitor indicated for the management of fibromyalgia." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a609016.html  (last visited July 13, 2015).

[7]Nexium is a brand name for "Esomeprazole, [which] is used to treat gastroesophageal reflux disease (GERD), a condition in which backward flow of acid from the stomach causes heartburn and possible injury of the esophagus (the tube between the throat and stomach)." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699054.html (last visited July 13, 2015).

[8]"Meclizine is used to prevent and treat nausea, vomiting, and dizziness caused by motion sickness." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682548.html (last visited July 13, 2015).

weight she lifted was twenty pounds, and she frequently lifted up to ten pounds. *Id.* Her work as a store cashier was not substantially different. (Tr. 157)

Plaintiff stated that she stopped working on February 2, 2007, "[b]ecause of [her] condition(s)." (Tr. 165) Though she wrote that she only completed the second grade, it is apparent that this was an error and that she meant to say she completed the twelfth grade. Plaintiff did not attend special education classes. *Id.* She has specialized computer training in Microsoft Word and Excel. *Id.*

### B.  Testimony at the Hearing

On September 24, 2012, the ALJ held a hearing, which plaintiff and her counsel attended. (Tr. 31–48) Plaintiff was fifty-five years old at the time of the hearing. (Tr. 34–35) She had two adult children. (Tr. 39–40) She graduated from high school, and she had two years of college education, for which she holds a certificate of fine arts. (Tr. 35)

Plaintiff worked for the NARA for nineteen years. (Tr. 36) She was terminated because she "couldn't do the production." *Id.* Plaintiff testified that after she did not make her production quota, she was placed on a "performance plan," after which her employer transferred her to a position in the mail room. (Tr. 36–37) Later, her employer decided to "reinvent[] the work system," after which it transferred her back to her original position, where she again could not meet her production quota, and she was terminated. (Tr. 36)

Plaintiff testified that she was suffering from depression during the time she was employed. (Tr. 38) She also testified that she continues to suffer from depression, and she has also developed anxiety. *Id.* In 2010, plaintiff developed

inner ear nerve damage, which caused episodes of dizziness and loss of balance. *Id.* She was given exercises to perform twice daily for the condition. (Tr. 47)

Plaintiff was taking Meclizine for her inner ear condition, but she testified that the medication was "not really" helpful. (Tr. 39, 47) She also testified that she "always suffer[ed] from depression," but it had grown worse after her mother died. *Id.* She claimed that she had been seeing Dr. McKinney, a psychologist, "[e]very two weeks on a Friday," since October 2009. (Tr. 41, 47) Plaintiff also saw Dr. Dara, a primary care physician, who first prescribed her Xanax for depression; Dr. Dara later withdrew that prescription in favor of Savella to treat both plaintiff's fibromyalgia pain and depression. (Tr. 41–42) According to plaintiff, the Savella is not effective at treating her depression. (Tr. 42)

Plaintiff testified that she sometimes cooked simple meals, but she admitted that she and her family frequently eat fast food brought home by her husband. *Id.* Her husband and oldest daughter are responsible for cleaning dishes, while her husband vacuums, sweeps, and does the laundry. *Id.* Plaintiff testified that she cares for her five- and six-year-old grandchildren. (Tr. 43) She sometimes attends church. *Id.* She spends her day watching television, sleeping, talking on the phone, caring for her grandchildren, and checking on her disabled sister. *Id.*

Plaintiff testified that she does the family's grocery shopping, which requires that she drive to the store; her husband unloads groceries when she returns home. (Tr. 44) She also testified that at least some of the time she walks through the store, loads a cart with groceries, and loads them in her car by herself. *Id.* She has no trouble driving to the store, which is close to her home. (Tr. 45) She also visits her sister at least once a month. *Id.*

Upon questioning by counsel, plaintiff testified that she had unspecified "depressive symptoms." *Id.* She claimed to suffer from "anxiety attacks," which she "started having . . . again" after her mother and mother-in-law died. *Id.* Plaintiff's purported anxiety attacks vary in frequency: "Sometimes I can get two or three a week and then the next week I might no[t] have any." (Tr. 46) When she has an attack, it lasts for "[m]aybe five or ten minutes." *Id.* She also claimed to suffer "crying spells" once a day, though she could not state whether they occurred more frequently than that. *Id.* Plaintiff stated that she spends most of her time at home in her bedroom by herself. *Id.*

### C. Medical Records

### 1. Pre-Application Records

Extensive medical records and notes were submitted regarding plaintiff's benign pleomorphic adenoma, a mass on her left face. (Tr. 199) The ALJ noted those records, and the Court has reviewed them in full. The Court limits its discussion of the mass to plaintiff's status post-surgery.

On July 28, 2009, plaintiff began a course of physical therapy under the supervision of Anna-Katherine Sevic, M.P.T. (Tr. 499) She completed sixteen of her seventeen scheduled visits. *Id.* When she began therapy, her pain was at best an eight out of ten, but she was able to achieve a zero pain level by the time she completed therapy on September 4, 2009. *Id.* In addition, plaintiff was able to walk for approximately forty-five minutes and stand to cook or clean for forty-five minutes to one hour without experiencing any lower back pain. *Id.* She had improved flexibility of her lower extremities and increased tolerance for lumbar stabilization exercises. *Id.*

Clayton Perry, M.D. examined plaintiff on November 19, 2009, at which time she complained of weakness in her right hand, but without numbness. (Tr. 250) She told Dr. Perry that she "recently has been dropping things," and that her left thumb trembled. *Id.* Plaintiff also had left knee pain that was consistent with osteoarthritis and that would occur if she sat for too long or ascended or descended stairs. *Id.* However, according to Dr. Perry, plaintiff had no tenderness to palpation, no muscle wasting, no subjective or objective numbness, and a full range of motion. *Id.* Moreover, while Dr. Perry's "impression [was] that she has [a] feeling that her hand is weak," Dr. Perry was "not sure if her weakness [was] real or just perceived." *Id.* Indeed, testing on plaintiff's right arm performed on December 18, 2009, by Laurence Kinsella, M.D. revealed "no electrical evidence of a right carpal tunnel syndrome . . . [,] ulnar neuropathy . . . [, or] cervical radiculopathy or other intraspinal canal process." (Tr. 252–53)

Rebecca Brandsted, M.D. examined plaintiff on December 10, 2009. (Tr. 199) Plaintiff had a cough, and Dr. Brandsted diagnosed her with a benign pleomorphic adenoma, which plaintiff opted to have removed. *Id.* The mass was surgically removed on January 27, 2010. (Tr. 204, 210)

On December 21, 2009, plaintiff told Dr. Perry that her left hand condition "may[]be a little bit better." *Id.* She also had "moderate relief" after a cortisone injection, though she "now [felt] as though it has worn off," at which point Dr. Perry prescribed Euflexxa.[9] *Id.* Dr. Perry treated plaintiff on several other occasions from November 2009 through January 2010. (Tr. 247–50) He ordered a course of

[9]"Euflexxa . . . is indicated for the treatment of pain in osteoarthritis (OA) of the knee in patients who have failed to respond adequately to conservative non-pharmacologic therapy and simple analgesics (*e.g.*, acetaminophen)." http://www.accessdata.fda.gov/cdrh_docs/pdf/P010029S008c.pdf (last visited July 14, 2015).

Euflexxa in both knees to address plaintiff's pain. *Id.* Dr. Perry noted that plaintiff "has no electrical evidence of radiculitis or nerve compression on her left hand[,] and [Dr. Perry] really h[ad] no explanation for the weakness that she has." (Tr. 249)

Dr. Brandsted examined plaintiff on February 4, 2010, for a follow-up to her "left deep parotidectomy." (Tr. 198) At that time, plaintiff said that she had "some pain but it is getting better each day." *Id.* There was no evidence of infection, and plaintiff's facial nerve was completely intact. *Id.* Dr. Brandsted concluded that plaintiff "is doing well." *Id.*

Dr. Brandsted examined plaintiff on May 10, 2010, a follow-up appointment for her "atypical facial pain." (Tr. 196) She complained of pressure below her left eye and shooting pains in her cheek. *Id.* Plaintiff stated that she "did not get any better at all with the [P]rednisone[10] or antibiotics." *Id.* However, plaintiff admitted that she did not take the full course of Prednisone. *Id.* Dr. Brandsted noted that plaintiff's CT results and physical examination were all normal. *Id.* The doctor wrote: "I am unsure what continues to cause her facial pain. She is well healed from the surgery . . . . I have recommended Motrin 600 mg twice daily and trying a bite block." *Id.* At another follow-up visit three days later, Dr. Brandsted added that plaintiff's examination was again "normal," and the Doctor did "not think this [pain] is in any[]way related to her parotid mastoid surgery." (Tr. 197)

---

[10]"Prednisone is used alone or with other medications to treat the symptoms of low corticosteroid levels . . . . Prednisone is also used to treat other conditions in patients with normal corticosteroid levels. These conditions include certain types of arthritis; severe allergic reactions; multiple sclerosis (a disease in which the nerves do not function properly); lupus (a disease in which the body attacks many of its own organs); and certain conditions that affect the lungs, skin, eyes, kidneys blood, thyroid, stomach, and intestines. Prednisone is also sometimes used to treat the symptoms of certain types of cancer." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601102.html (last visited July 14, 2015).

Plaintiff complained of pressure in her left lateral face on May 20, 2010, but records from her visit at St. Mary's Health Center showed "no abnormality." (Tr. 204–06, 219) On August 26, 2010, Dr. Karen Baranski performed an MRI of plaintiff's brain following plaintiff's complaints of continued facial pain. (Tr. 223) With the exception of "low lying cerebellar tonsils," the MRI was "otherwise unremarkable." *Id.*

Dr. Perry examined plaintiff three additional times between April and May of 2010. (Tr. 244–46) At that time, plaintiff was suffering from a "mallet finger," which Dr. Perry splinted and, by May 20, "seem[ed] to have resolved." *Id.* Dr. Perry also examined plaintiff at least six more times between July and September of 2010. (Tr. 237–43) She was injected with Euflexxa in both of her knees without complications. *Id.* She was also injected with Depo-Medrol,[11] Marcaine,[12] and Lidocaine.[13] *Id.*

Plaintiff reported to the emergency room on August 13, 2010, complaining of right foot pain. (Tr. 294) She had not attempted to alleviate her pain with any medication. *Id.* She was diagnosed with unspecified gout, had normal alignment of the foot, and the medical personnel noted no acute findings. (Tr. 296–97)

On October 21, 2010, and December 15, 2010, plaintiff was seen by Joel Riley, M.D. because she was complaining of "abdominal bloating" following a

---

[11]"**Error! Main Document Only.**Depo-Medrol, or Methylprednisolone, is a corticosteroid used to relieve inflammation." http://www.nlm.nih.gov/medlineplus/druginfo/meds/a601157.html (last visited July 14, 2015).

[12]"Marcaine is indicated for the production of local or regional anesthesia or analgesia for surgery, dental and oral surgery procedures, diagnostic and therapeutic procedures, and for obstetrical procedures." http://dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=67578b56-7540-487e-1fba-481255620e78 (last visited July 14, 2015).

[13]Lidocaine "causes numbness . . . in an area of [the] body. It is a local anesthetic." http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010944/ (last visited July 14, 2015).

diagnosis of gastroesophageal reflux disease (GERD). (Tr. 270) During her physical exam, she was not in any distress, she had no edema, and her abdomen was normal. (Tr. 271) Dr. Riley found that plaintiff had "unspecified constipation." (Tr. 274) On October 27, 2010, plaintiff was diagnosed by David Weinstein, M.D. with osteoporosis of the lumbar spine and of the proximal left femur or femoral neck, for which she was advised to begin a Vitamin D regimen. (Tr. 259–60, 496)

On January 14 and 28, 2011, plaintiff was evaluated by Juankee McKinney, Ph.D., a clinical psychologist. (Tr. 337, 339–40) She was anxious, particularly about death, but willing to address her anxiety "more aggressively." (Tr. 338–39) Dr. McKinney prescribed only additional therapy and relaxation exercises, not medication, to treat plaintiff's anxiety. (Tr. 338, 340)

On February 11, 2011, plaintiff again was evaluated by Dr. McKinney. (Tr. 335) She was anxious about an upcoming MRI. *Id.* Dr. McKinney described plaintiff's prognosis as "good" and said that her status was "improved." (Tr. 336) Dr. McKinney told her to do relaxation exercises and did not prescribe any medication for plaintiff's psychological symptoms. *Id.*

Also on February 11, 2011, Bradley Stockmann, M.D. performed an MRI on plaintiff's spine. (Tr. 285) He found no abnormal marrow signal, and plaintiff's lumbar vertebral body height and alignment were normal. *Id.* Plaintiff had "diffuse disc bulge[s]" but "without significant central canal narrowing" and with mild narrowing of the "bilateral neural foramina" at L4-L5 and L5-S1. *Id.* Dr. Stockmann diagnosed plaintiff with "[m]ild lumbar spondylosis" with "mild narrowing of the neural foramen at L4-L5 and L5-S1." *Id.*

On February 25, 2011, plaintiff was again seen by Dr. McKinney. (Tr. 333) She complained that she was "feeling extremely stressed" and anxious regarding forthcoming MRI results. *Id.* Though Dr. McKinney noted that plaintiff was anxious and depressed, her prognosis was "good." (Tr. 334) Dr. McKinney prescribed further cognitive therapy, without any accompanying medication. *Id.*

On March 15, 2011, Dr. James Hoffman, a chiropractor, wrote a letter detailing plaintiff's treatment for a September 30, 2010, "fall in which injuries to the upper back, mid back[,] and low back were sustained." (Tr. 305) According to Dr. Hoffman, plaintiff had thoracic nerve root compression and strain or sprain, as well as lumbar nerve root compression and strain or sprain. *Id.* Her treatment for those conditions was "conservative," merely additional physical therapy. (Tr. 306)

A few days later, on March 21, Dr. S. Vic Glogovac examined plaintiff and noted that she "may have an aberrant carpal tunnel syndrome," which resulted in her primary complaint that he has a tendency to drop objects, with "morning tingling." (Tr. 322) However, Dr. Glogovac's testing of the condition was "unrevealing." *Id.*

## 2. Post-Application Records

On May 5, 2011, plaintiff again saw Dr. McKinney for therapy. (Tr. 328) She was anxious, but her appearance and thought were unremarkable; she was coherent and logical in her speech; she had fair judgment and good orientation, average intellect, and normal behavior. (Tr. 329) The psychologist's narrative notes of the therapy session are largely illegible, but it is apparent that the death of plaintiff's mother was one source of anxiety. (Tr. 330) Dr. McKinney determined

that plaintiff's prognosis was "good," and she prescribed further cognitive therapy, without any accompanying medication. *Id.*

On June 29, 2011, Dr. McKinney also determined that plaintiff's prognosis was "good," and she had "improved." (Tr. 501) Plaintiff had a good prognosis and her condition had improved on October 7, 2011. (Tr. 505) The same was true on October 28 and November 11, 2011, and again on March 2, March 30, April 13, May 11, May 25, July 14, and August 3, 2012. (Tr. 507, 509, 515, 519, 521, 525, 528–29, 531) According to Dr. McKinney, plaintiff did not regress in therapy, and she was never prescribed any medication for her depression, anxiety, or panic disorder. (Tr. 501–31)

Sometime in June 2011, plaintiff sprained her left foot. (Tr. 346) She was examined several times for that condition by Joshua Nadaud, M.D., who noted that she has flat feet. (Tr. 343–47) On November 22, 2011, Dr. Nadaud observed that plaintiff had "[n]o evidence of any depression" and "no acute distress." (Tr. 346)

On November 29, 2011, plaintiff began a course of physical therapy for her left ankle osteoporosis and instability conditions. (Tr. 396) She had nineteen sessions with physical therapist Danielle Cullen. *Id.* During the course of therapy, she missed two appointments. (Tr. 405) Though she was noted to have previously had a "normal gait pattern" and to have "improved," plaintiff "reported she has had 'no change' in function and [that] 'it still hurts.'" *Id.* However, she also said that she had "not been wearing her ankle brace." *Id.* Cullen observed that, "[t]his patient is able to perform other aggressive, in-house activities with little to no complaints of pain." *Id.* While her "pain complaints have not decreased significantly throughout the course of treatment," Cullen explained, the objective

indications were that she had "made significant improvements with her left ankle [range of motion] and strength." *Id.* By January 27, 2012, plaintiff was discharged from all physical therapy; "treatment was discontinued with a significant percentage of the treatment goals achieved." (Tr. 396)

On January 31, 2012, Dr. Nadaud observed that plaintiff has a history of a left ankle sprain with instability and right posterior tibial tendinitis. (Tr. 343) Plaintiff reported that "she is getting somewhat better." *Id.* She had reduced swelling, but she was wearing "flimsy shoes." *Id.* Dr. Nadaud advised her to wear "more robust tennis shoes," which he indicated would "help her significantly." *Id.* Plaintiff self-reported that she was making progress and her pain was reduced. *Id.* Objectively, she had a negative "AP drawer test" and a negative "anterolateral rotary instability test." *Id.* Dr. Nadaud's assessment was that her right posterior tibial tendinitis had resolved, that she should continue physical therapy, that she should wear her lace-up ankle brace on her left side, and that she ought to wear better shoes for her left ankle sprain, which had negative instability. (Tr. 343, 345)

Plaintiff was again seen by Dr. McKinney on March 11, 2012, when she complained of unspecified "pain." (Tr. 331) Dr. McKinney's notes are difficult to decipher, but she indicated that plaintiff was continuing to complain of anxiety. (Tr. 332)

On March 22, 2012, Dr. Brandsted observed that plaintiff was experiencing a chronic cough, and she was having GERD symptoms, for which she had just restarted taking Nexium. (Tr. 348–49) The doctor noted that she had not had any recent facial pain. (Tr. 348) Overall, plaintiff's prognosis was "better." (Tr. 349) Plaintiff denied any fatigue or depression during that examination. (Tr. 350) Dr.

Brandsted prescribed additional Nexium and a dose of Prednisone for plaintiff's symptoms. (Tr. 352)

Plaintiff was examined for "dizzy spells" by Bhajan Dara, M.D. on June 2, 2012. (Tr. 431) Her EKG, chest x-ray, and CT scans were all negative for abnormalities. *Id.* She was ambulatory. (Tr. 431) Though Dr. Dara noted that plaintiff has a history of fibromyalgia, the physician also reported that plaintiff's "family tells me that she is [a] worry wart." *Id.* At the time of that examination, plaintiff was taking Savella for her fibromyalgia. *Id.* Dr. Dara prescribed rest and a short-term dose of Hydrocodone-Acetaminophen[14] for plaintiff's pain. (Tr. 432)

The next day, plaintiff was seen again, and Dr. Dara noted that, "patient comes in the office with new [a] complain[t] each time . . . ." (Tr. 433) She had complained of pain in her left leg, "which is better now." *Id.* In fact, plaintiff had been ambulating in and out of bed unassisted since her admission. *Id.* She was noted to have no fever, shaking, chills, or joint swelling. *Id.* Plaintiff was observed not to be in any distress, and she was discharged. (Tr. 434–35)

An MRI of plaintiff's brain performed on June 13, 2012, was also unremarkable except for "mild nonspecific white matter foci" and a "[m]ild Chiari I malformation,"[15] which was observed to have produced "no brainstem signal abnormality." (Tr. 451) Algis Babusis, M.D. had reported on June 3 that plaintiff's Chiari I malformation previously had been diagnosed, that there were "no acute

---

[14]"Hydrocodone and acetaminophen combination is used to relieve moderate to moderately severe pain. Acetaminophen is used to relieve pain and reduce fever in patients." http://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010590/ (last visited July 14, 2015).

[15]"Chiari malformations (CMs) are structural defects in the cerebellum, the part of the brain that controls balance. . . . *Type I* involves the extension of the cerebellar tonsils (the lower part of the cerebellum) into the foramen magnum, without involving the brain stem. . . . Type I—which may not cause symptoms—is the most common form of CM." http://www.ninds.nih.gov/disorders/chiari/detail_chiari.htm (last visited July 14, 2015).

findings," and that the Chiari I malformation is "often an incidental finding." (Tr. 456) On June 25, 2012, plaintiff followed up with Dr. Dara, seeking the results of her MRI. (Tr. 463) At that time, plaintiff had no complaints. *Id.* Dr. Dara determined that her MRI was normal and also noted that plaintiff said she was "looking for a disability reason." *Id.*

On July 12, 2012, plaintiff was again examined by Dr. Brandsted. (Tr. 440) She complained of dizziness that had begun four weeks earlier. *Id.* She was having episodes of dizziness once a week, for several minutes at a time, resulting in unsteady gait. *Id.* But plaintiff was not experiencing vertigo. *Id.* At that time, plaintiff denied any depression. *Id.* Her ear examination was normal. (Tr. 441) Plaintiff was able to move all of her extremities well, and she had a normal gait. *Id.* Her MRI and CT scan of the brain were both negative for abnormalities. (Tr. 442) Because the "etiology of [plaintiff's] dizziness [was] unclear," Dr. Brandsted prescribed Meclizine to treat her condition. *Id.* On August 9, 2012, Dr. Brandsted noted that plaintiff's ENG was reviewed; it showed a reduced vestibular response on the right side, indicting right vestibular weakness, but the results were otherwise normal. (Tr. 449) No additional course of treatment was prescribed based on the ENG results. *Id.*

On July 30, 2012, Charles Francois, M.D. examined plaintiff for her balance condition. (Tr. 458) Plaintiff complained of "intermittent sensation of unsteadiness that began [in May 2012]." *Id.* According to plaintiff, her "symptoms tend to last just less than a minute[,] and seem to occur two to three times a week." *Id.* All of plaintiff's test results were normal except for a 26% weakness in her right ear upon caloric testing. (Tr. 459–60)

Dr. Brandsted examined plaintiff again on August 13, 2012 as a follow-up appointment regarding her continuing cough. (Tr. 443) Plaintiff "seem[ed] a little better," and she had not experienced any recent facial pain. *Id.* Her cough had resolved. *Id.*

On August 20, 2012, Dr. McKinney completed a medical source statement. (Tr. 534) The psychologist assessed plaintiff's global assessment of functioning (GAF) at 51, with her highest GAF score a 55. *Id.* According to Dr. McKinney, plaintiff's anxiety and depression "interfere with her ability to focus and pay attention for a sustained period of time," though "no psychological testing ha[d] been performed." (Tr. 538) Dr. McKinney estimated that plaintiff's impairments would cause her to miss work more than four days per month. *Id.* The psychologist reported that plaintiff's "panic occurs randomly and [is] not associated with any particular event." *Id.* Plaintiff's "anxiety and depression inhibit [plaintiff] from initiating and performing tasks to completion[,] which greatly jeopardizes her ability to be successful in work situations." *Id.* Yet, Dr. McKinney did not order any medications to treat plaintiff's condition, only further therapy. *Id.*

### III. The ALJ's Decision

In the decision issued on October 18, 2012, the ALJ made the following findings:

1. Plaintiff last met the insured status requirements of the Social Security Act on June 30, 2012.

2. Plaintiff did not engage in substantial gainful activity during the period from her alleged onset date of September 26, 2009, through her date last insured of June 30, 2012.

3. Plaintiff has the following severe impairments: (1) major depression; (2) panic disorder; (3) degenerative disc disease of the lumbar spine; (4) polyneuropathy; (5) atypical facial pain; and (6) osteoporosis.

4.    Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.    Plaintiff has the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), where she can occasionally climb ramps and stairs but never climb ladders, ropes, or scaffolds; she can frequently balance, stoop, kneel, crouch, and crawl; she must avoid all concentrated exposure to unprotected heights; and she can perform both unskilled and semi-skilled work.

6.    Plaintiff is capable of performing her past relevant work as an archives technician. This work did not require the performance of work-related activities precluded by her RFC.

7.    Plaintiff has not been disabled within the meaning of the Social Security Act from September 26, 2009, through June 30, 2012, the date last insured.

(Tr. 9–26).

## IV.    Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." *Long v. Chater*, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." *Estes v. Barnhart*, 275 F.3d 722, 724 (8th Cir. 2002) (quoting *Johnson v. Apfel*, 240 F.3d 1145, 1147 (8th Cir. 2001)). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner. *Buckner v. Astrue*, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. § 423(a)(1)(D), (d)(1)(A); *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009).  The Commissioner has established a five-step process for determining whether a person is disabled.  *See* 20 C.F.R. § 404.1520; *Moore v. Astrue*, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  *Lacroix v. Barnhart*, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  *Pate-Fires*, 564 F.3d at 942.  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five.  *Id.*

APrior to step four, the ALJ must assess the claimant=s residual functioning capacity (>RFC=), which is the most a claimant can do despite her limitations.@ <u>Moore</u>, 572 F.3d at 523 (<u>citing</u> 20 C.F.R. ' 404.1545(a)(1)).  "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2.  "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and

others, and an individual's own description of [her] limitations." *Moore*, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. *Wagner v. Astrue*, 499 F.3d 842, 851 (8th Cir. 2007); *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2002). This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." *Buckner*, 646 F.3d at 558 (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" *Id.* (quoting *Goff v. Barnhart*, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000); *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether the claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that she cannot return to her past relevant work. *Moore*, 572 F.3d at 523; *accord*

*Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006); *Vandenboom v. Barnhart*, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. *Banks v. Massanari*, 258 F.3d 820, 824 (8th Cir. 2001); *see also* 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V.    Discussion

To be entitled to disability benefits under Title II, plaintiff has the burden of showing she was disabled prior to June 30, 2012, the date she was last insured. *Jenkins v. Colvin*, No. 2:12-CV-91-JAR, 2014 WL 1259771, at *2 (E.D. Mo. Mar. 26, 2014); *see also* 20 C.F.R. § 404.130; *Moore*, 572 F.3d at 522; *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006). "Evidence from outside the insured period can be used in 'helping to elucidate a medical condition during the time for which benefits might be rewarded.'" *Cox*, 471 F.3d at 907 (quoting *Pyland v. Apfel*, 149 F.3d 873, 876 (8th Cir. 1998)). However, to be entitled to Title II benefits, plaintiff must prove she was disabled before her insurance expired. *Id.*

Plaintiff asserts that the ALJ erred (1) when he determined that plaintiff has the RFC to perform light, semi-skilled work, with some restrictions and (2) by failing to assess the physical and mental demands of plaintiff's past relevant work when he determined that, based on plaintiff's RFC, she could return to that work.

## A.  Residual Functional Capacity

22

Plaintiff alleges that the ALJ committed three errors that undermine his determination that plaintiff has the RFC to perform light, semi-skilled work, with some restrictions. According to plaintiff: (1) The ALJ failed to cite "some" medical evidence to support his RFC determination. (2) The ALJ over-credited plaintiff's self-described daily activities in calculating the RFC. (3) The ALJ discounted Dr. McKinney's medical source statement without justification when he determined the RFC.

A claimant's RFC is "the most a claimant can still do despite his or her physical or mental limitations." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (internal quotations, alteration, and citations omitted). "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." *Id.* (citation omitted). The ALJ should obtain medical evidence that addresses the claimant's "ability to function in the workplace." *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001) (quoting *Nevland v. Apfel*, 204 F.3d 853, 858 (8th Cir. 2000)). "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." *Id.* Even though the RFC assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner. *Cox v. Astrue*, 495 F.3d 614, 619 (8th Cir. 2007) (citing 20 C.F.R. §§ 416.927(e)(2), 416.946). "Because the social security disability hearing is non-adversarial, however, the ALJ's duty to develop the record exists independent of the claimant's burden in this case." *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2004).

## 1. **Evidence supporting the RFC finding**

Plaintiff contends the ALJ failed to cite "some" medical evidence that reasonably leads to the conclusion that plaintiff has the RFC to perform light, semi-skilled work. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 416.967(b). "Semi-skilled work is work which needs some skills but does not require doing the more complex work duties. Semi-skilled jobs may require alertness and close attention to watching machine processes; or inspecting, testing or otherwise looking for irregularities; or tending or guarding equipment, property, materials, or persons against loss, damage or injury; or other types of activities which are similarly less complex than skilled work, but more complex than unskilled work. A job may be classified as semi-skilled where coordination and dexterity are necessary, as when hands or feet must be moved quickly to do repetitive tasks." 20 C.F.R. § 404.1568(b).

In her disability application plaintiff established that her past relevant work as a clerical worker was semi-skilled work, where she was required to type, answer telephones, examine military records, redact Social Security numbers, search for specific documents and copy them, and transport files. (Tr. 156) That work was also light work because she would sit for approximately seven hours out of an eight hour workday, but she frequently lifted up to ten pounds. *Id.* Thus, the record before the ALJ was uncontested that plaintiff had once been capable of performing, and she did perform, light, semi-skilled work. The ALJ then considered the

existence and severity of plaintiff's symptoms to determine whether she was presently capable of such performance, ultimately concluding that plaintiff can still perform light, semi-skilled work, with the restrictions noted above. (Tr. 16)

To reach his conclusion that plaintiff can perform light, semi-skilled work, the ALJ first found that plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms. (Tr. 18) Plaintiff alleges no error with that determination. Second, however, in evaluating the intensity, persistence, and limiting effects of plaintiff's symptoms, the ALJ found that after taking those factors into account, plaintiff could still perform light, semi-skilled work. *Id.* Plaintiff alleges the ALJ erred in evaluating the limiting effects of her symptoms, claiming the ALJ did not cite any medical evidence to support his conclusion that plaintiff has the RFC to perform light, semi-skilled work. *But see Lauer*, 245 F.3d at 704 (holding that "the burden of persuasion to prove disability and demonstrate RFC remains on the claimant").

Plaintiff wholly ignores the ALJ's analysis, which cites substantial medical and other evidence to support the conclusion that plaintiff can perform light, semi-skilled work with the noted restrictions. In *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), the Eighth Circuit set forth factors an ALJ must consider in evaluating the credibility of a plaintiff's testimony and complaints, in addition to the objective medical evidence. These factors include:

> (1) the claimant's daily activities; (2) the duration, intensity, and frequency of pain; (3) the precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints.

*Moore*, 572 F.3d at 524 (citing *Polaski*, 739 F.2d at 1322). Moreover, a claimant's subjective complaints may be discounted if there are inconsistencies in the record as a whole. 20 C.F.R. §§ 404.1529, 416.929; *McKinney v. Apfel*, 228 F.3d 860, 864 (8th Cir. 2000); *Polaski*, 739 F.2d at 1322; *see Smith v. Colvin*, 756 F.3d 621, 625 (8th Cir. 2014) (explaining that a court is to "defer to the ALJ's evaluation of [a claimant's] credibility, provided that such determination is supported by good reasons and substantial evidence, even if every factor is not discussed in depth" (internal quotation marks and citation omitted)).

Contrary to plaintiff's assertion, the ALJ considered significant medical and other evidence to determine that plaintiff is capable of performing light, semi-skilled work. First, as the ALJ explained, "a review of the record in this case reveals no restrictions recommended by any doctor treating [plaintiff's] physical impairments." (Tr. 25) For that reason, among others, the ALJ found that plaintiff's "statements concerning the intensity, persistence[,] and limiting effects of [her] symptoms are not credible," such that she retained the RFC to perform light, semi-skilled work, with some restrictions. (Tr. 18) Where a plaintiff's medical records show a lack of significant restrictions imposed by treating physicians, such evidence supports an ALJ's finding of no disability. *See Choate v. Barnhart*, 457 F.3d 865, 870 (8th Cir. 2006); *Brown v. Chater*, 87 F.3d 963, 965 (8th Cir. 1996); *see also* 20 C.F.R. §§ 404.1530, 416.930.

Furthermore, the ALJ devoted significant portion of his well-reasoned analysis of plaintiff's RFC. The ALJ did not fail to cite any medical and other evidence; rather, he found substantial evidence that the RFC was supported by:

(a) the claimant's own reports of her capabilities and daily activities;
(b) the lack of objective findings in the medical evidence to support

> such limitations; (c) the routine and/or conservative treatment the claimant received; (d) the numerous office visits with various doctors at which she did not enumerate any specific complaint; (e) the successful treatment through medications and physical therapy for her physical impairments; (f) the treatment notes from Dr. McKinney indicating she was improving and that her prognosis was good at virtually every counseling appointment; and[] (g) the absence of any physical restrictions [or] limitations from any of the claimant's treating physicians.

(Tr. 25)  Those findings, which are supported by the ALJ's thorough analysis, establish that substantial evidence exists that plaintiff has the RFC to perform light, semi-skilled work, with the noted restrictions.  Therefore, the ALJ did not err by failing to cite sufficient evidence to support the RFC determination.

## 2. <u>Daily Activities</u>

Plaintiff next contends that the ALJ's assessment of her RFC was erroneous because, in her view, the ALJ did not articulate how plaintiff's extensive daily activities equate to the ability to work in full-time employment.  But plaintiff again misconstrues the ALJ's analysis.  First, the ALJ never said that plaintiff's daily activities alone were sufficient to determine that she is capable of performing light work.  Rather, as *Pulaski* and its progeny instruct, the ALJ considered plaintiff's extensive daily activities along with the medical and other evidence to reach his determination that plaintiff can perform light, semi-skilled work.  *See Steed v. Astrue*, 524 F.3d 872, 876 (8th Cir. 2008) (citing *Pulaski* and holding that an ALJ may find that a claimant's credibility is diminished by inconsistencies between her daily activities and her alleged limitations).

Second, the ALJ's assessment that plaintiff's daily activities suggest she is not disabled was not erroneous.  That is so because, in determining plaintiff could perform light work, the ALJ could properly consider the fact that plaintiff prepares

her own meals, takes medication and grooms herself without reminders, washes dishes, irons clothes, changes bed linens, drives, cares for her grandchildren, manages her finances without assistance, uses Facebook, visits her sister, and attends the YMCA almost daily. (Tr. 146–49); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011); *Medhaug v. Astrue*, 578 F.3d 805, 817 (8th Cir. 2009) ("[A]cts such as cooking, vacuuming, washing dishes, doing laundry, shopping, driving, and walking, are inconsistent with subjective complaints of disabling pain."); *Roberson v. Astrue*, 481 F.3d 1020, 1025 (8th Cir. 2007) (finding that caring for a child, driving, fixing simple meals, doing housework, and shopping are "extensive daily activities" that did not support the claimant's alleged inability to work). Therefore, the ALJ's consideration of plaintiff's daily activities was not error, and the RFC formulated in part on that basis is not legally deficient.

### 3. Dr. McKinney's medical source statement

Plaintiff asserts that the ALJ erred when he accorded no weight to Dr. McKinney's August 20, 2012, medical source statement. (Tr. 24–25, 534–39) Dr. McKinney was plaintiff's examining and treating psychologist. Generally, the Commissioner gives more weight to the opinion of a source who has examined a claimant than a source who has not. 20 C.F.R. § 419.927(c)(1). When the treating physician's opinion is supported by proper medical testing, and is not inconsistent with other substantial evidence in the record, the ALJ must give the opinion controlling weight. *Anderson v. Astrue*, 696 F.3d 790, 793 (8th Cir. 2012) (citing 20 C.F.R. § 404.1527(c)(2)). An examining physician's opinion, however, neither inherently or automatically has controlling weight and "does not obviate the need to

evaluate the record as a whole." *Cline v. Colvin*, 771 F.3d 1098, 1103 (8th Cir. 2014) (internal quotations and citations omitted).

"An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010) (internal quotation omitted). Moreover, "[a]n ALJ is entitled to give less weight to the opinion of a treating doctor where the doctor's opinion is based largely on the plaintiff's subjective complaints rather than on objective medical evidence." *Rosa v. Astrue*, 708 F. Supp. 2d 941, 950 (E.D. Mo. 2010); *see also Davis v. Shalala*, 31 F.3d 753, 756 (8th Cir. 1994); *Loving v. Dep't Health & Human Serv.*, 16 F.3d 967, 971 (8th Cir. 1994). An ALJ may not substitute his own opinions for the opinions of medical professionals. *Ness v. Sullivan*, 904 F.2d 432, 435 (8th Cir. 1990); *see also Pate-Fires*, 564 F.3d at 946–47 (instructing that ALJs may not "play doctor"). However, an ALJ "need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment." *Qualls v. Apfel*, 158 F.3d 425, 428 (8th Cir. 1998) (internal quotations and citations omitted). Ultimately, the ALJ must "give good reasons" to explain the weight given the treating physician's opinion. 20 C.F.R. § 404.1527(c)(2). But, of course, an ALJ is not required to discuss in detail every item of evidence. *Morrison v. Apfel*, 146 F.3d 625, 628 (8th Cir. 1998).

Plaintiff asserts that the ALJ erred by failing to explain his reasons for not giving any weight to Dr. McKinney's medical source statement. The assertion is contradicted by the opinion in which nearly a full page is devoted to analyzing Dr.

McKinney's medical source statement and explaining the ALJ's reasons for giving it no weight. (Tr. 24–25) Among the ALJ's reasons for discrediting the opinion was that Dr. McKinney "relied quite heavily on the subjective report of symptoms and limitations provided by the claimant, and seemed to uncritically accept as true most, if not all, of what the claimant reported." (Tr. 24) That was an acceptable reason to discount the source statement. *See Rosa*, 708 F. Supp. 2d at 950.

Moreover, the ALJ referred to his previously-articulated reasons for discounting plaintiff's subjective complaints as a basis for discounting Dr. McKinney's reliance on those subjective complaints and, thus, giving her source statement no weight. *See Smith*, 756 F.3d at 625; 20 C.F.R. § 404.1527(c)(2). Also, the ALJ explained that Dr. McKinney's source statement appeared to be inconsistent with her treatment notes. (Tr. 24–25) Her notes failed to reveal "significant clinical and laboratory abnormalities," and they evinced a conservative course of treatment in which plaintiff was never prescribed psychotropic medications, she was consistently noted to be "improving," and her prognosis was "good." *Id.* Such internal inconsistencies entitled the ALJ to accord no weight to Dr. McKinney's source statement. *See Wildman*, 596 F.3d at 964.

Furthermore, the ALJ did not err in giving some weight to Dr. McKinney's treatment records from plaintiff's therapy sessions while at the same time giving no weight to Dr. McKinney's conclusions in the medical source statement which were inconsistent with those records. An "ALJ is not required to rely entirely on a particular physician's opinion," *Martise*, 641 F.3d at 927, and "an appropriate finding of inconsistency with other evidence alone is sufficient to discount [an] opinion." *Goff*, 421 F.3d at 790–91. Finally, to the extent that Dr. McKinney's

source statement can be read to suggest that plaintiff cannot work, that question is outside Dr. McKinney's expertise and is reserved to the Commissioner.  *See Qualls*, 158 F.3d at 428.

### B. Past Relevant Work

Plaintiff additionally contends that the ALJ erred at step four of the sequential evaluation process because he did not conduct a function-by-function analysis of plaintiff's past relevant work.  *I.e.*, the ALJ did not make explicit findings concerning the physical and mental demands of plaintiff's past relevant work as required by SSR 82-62 and by *Pfitzner v. Apfel*, 169 F.3d 566 (8th Cir. 1999).

"An ALJ may find the claimant able to perform past relevant work if the claimant retains the ability to perform the functional requirements of the job as she actually performed it or as generally required by employers in the national economy."  *Samons v. Astrue*, 497 F.3d 813, 821 (8th Cir. 2007).  To that end, the Social Security Administration's regulations mandate that, where "we cannot make a determination or decision at the first three steps of the sequential evaluation process, we will compare our [RFC] assessment . . . with the physical and mental demands of your past relevant work."  20 C.F.R. §§ 404.1520(f), 416.920(f).

The Administration's own interpretation of its regulations provides that:  "The decision as to whether the claimant retains the functional capacity to perform past work . . . must be developed and explained fully in the disability decision."  SSR 82-62, 1982 WL 31386, at *3.  "Adequate documentation of past work includes factual information about those work demands which have a bearing on the medically established limitations.  Detailed information about strength, endurance, manipulative ability, mental demands and other job requirements must be obtained

31

as appropriate." *Id.*

Commensurate with those regulations, the Eighth Circuit requires that, in addition to determining a plaintiff's RFC, at step four of the sequential evaluation process, "[t]he ALJ must also make explicit findings regarding the actual physical and mental demands of the claimant's past work." *Pfitzner*, 169 F.3d at 569 (quoting *Groeper v. Sullivan*, 932 F.2d 1234, 1239 (8th Cir. 1991)). An ALJ may obtain information from the claimant or the claimant's past employer "as to the physical and mental demands of her position" as it was actually performed. *Kirby v. Sullivan*, 923 F.2d 1323, 1327 (8th Cir. 1991); *see* 20 C.F.R. §§ 404.1565(b), 416.965(b). Alternatively, "[t]he ALJ may discharge this duty by referring to the specific job descriptions in the *Dictionary of Occupational Titles* that are associated with the claimant's past work." *Pfitzner*, 169 F.3d at 569. "The ALJ may also rely on vocational expert testimony to fulfill this obligation." *James v. Astrue*, No. 4:07-CV-1382-HEA-DDN, 2008 WL 4204712, at *10 (E.D. Mo. Sept. 8, 2008); *see* 20 C.F.R. § 404.1560(b)(2).

Furthermore, the Eighth Circuit has explained that, following an analysis of the demands of a claimant's past work, "the ALJ should compare the claimant's [RFC] with the actual demands of the past work to determine whether the claimant is capable of performing the relevant tasks." *Groeper*, 932 F.2d at 1238–39 (citations omitted). "A conclusory determination that the claimant can perform past work, without these findings, does not constitute substantial evidence that the claimant is able to return to his past work." *Id.* at 1239 (citations omitted); *see also Ingram v. Chater*, 107 F.3d 598, 605 (8th Cir. 1997). "The ALJ's failure to fulfill this obligation requires reversal." *Groeper*, 932 F.2d at 1238.

Here, the ALJ made the following finding with regard to plaintiff's ability to return to her past relevant work: "In comparing the claimant's [RFC] with the physical and mental demands of [her past relevant] work, the undersigned finds that the claimant was able to perform it as actually and generally performed." (Tr. 25) The ALJ did not make any specific findings about the physical and mental demands of plaintiff's past relevant work as she performed it. The ALJ likewise did not cite to the *Dictionary of Occupational Titles* to detail the physical and mental demands of that work as it is generally performed. Nor did the ALJ engage a vocational expert to testify about the physical and mental demands of that position. Finally, having not articulated those demands, the ALJ provided no more than a "conclusory determination" that he had compared plaintiff's RFC to the physical and mental demands of her past relevant work. *Groeper*, 932 F.2d at 1239. The ALJ's failure to articulate the physical and mental demands of plaintiff's past relevant work and to compare those demands with plaintiff's RFC was therefore error. *Id.* at 1238.

The Commissioner argues that the ALJ's failure to perform the required analysis was harmless error, because at step four plaintiff has the burden to prove disability. *See Battles v. Sullivan*, 902 F.2d 657, 659 (8th Cir. 1990) (quoting SSR 82-62, and holding that if the record contains substantial evidence that a claimant can perform her past work, the ALJ's failure to develop the past work record in full detail does not require remand); *see also Owen v. Astrue*, 551 F.3d 792, 801 (8th Cir. 2008) (holding that "an arguable deficiency in opinion-writing technique does not require us to set aside an administrative finding when that deficiency had no bearing on the outcome" (quotation marks and citation omitted)); *Kirby*, 923 F.2d

at 1326 (acknowledging that a claimant bears the burden of demonstrating that she cannot return to her past relevant work, but also explaining that an ALJ is required to "fully investigate and to make explicit findings regarding the actual physical [and mental] demands" of that work).

The error was not harmless in this case. Again, the ALJ did not detail the physical and mental demands of plaintiff's past relevant work. He said only that she had worked "reproducing military records." (Tr. 24) Yet, the ALJ determined that plaintiff's major depression and panic disorder were severe impairments. (Tr. 14) He also found that plaintiff suffered from moderate difficulties with social functioning, concentration, persistence, and pace. (Tr. 15) The ALJ additionally found that plaintiff's severe impairments could reasonably be expected to cause her alleged symptoms, *e.g.*, an inability to maintain concentration. (Tr. 18) And though the ALJ gave no weight to Dr. McKinney's medical source statement (Tr. 24–25), the ALJ elsewhere at least partially credited Dr. McKinney's analysis of plaintiff's mental impairments, basing the RFC in part on the fact that plaintiff's symptoms were "improving." (Tr. 25) Thus, the ALJ found plaintiff has at least some mental impairments, which must be accounted for in determining whether she can perform her past relevant work.

Moreover, the ALJ confusingly wrote on one hand that plaintiff "was let go because she could not make her production" and on the other hand that she "stopped working due to a business-related layoff." (Tr. 24) The ALJ concluded that plaintiff was performing her job "adequately," but he did not account for the mental demands of plaintiff's position. Those unarticulated demands, coupled with plaintiff's severe mental impairments and moderate difficulty with concentration,

34

persistence, and pace, may explain why she could not make her production quota and was terminated. While the ALJ found that plaintiff's termination was not related to any disabling impairments, that finding is questionable absent any reference to the specific mental demands of the job.

Because the ALJ failed to articulate the mental demands for comparison with the impairments the ALJ recognized, the error was not harmless. The ALJ's error was also not harmless because plaintiff's self-described work-related tasks included activities that might require significant concentration, persistence, and pace, which must be accounted for. Therefore, the Court must reverse the ALJ's decision and remand the case. *See Groeper*, 932 F.2d at 1238.

## VI.    Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **reversed** and the matter is **remanded** pursuant to the fourth sentence of 42 U.S.C. § 405(g) for further proceedings.


_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 14th day of August, 2015.